Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KYLE KRUCHOK,<br><br>          Plaintiff,<br><br>     v.<br><br>HARVEST CAPITAL CREDIT CORPORATION, JOSEPH A. JOLSON, RICHARD P. BUCKANAVAGE, DORIAN B. KLEIN, JACK G. LEVIN, RICHARD A. SEBASTIAO,<br><br>          Defendants. | Case No:<br><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kyle Kruchok ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1.      This is an action against Harvest Capital Credit Corporation ("Harvest Capital," "HCAP" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated

1

thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Harvest Capital by Portman Ridge Finance Corporation ("Portman" or "PTMN"), Rye Acquisition Sub Inc. ("Acquisition Sub"), a direct wholly-owned subsidiary of Portman, and Sierra Crest Investment Management LLC ("Sierra Crest"), the external investment adviser to Portman.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company maintains offices in New York, New York.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff is, and has been at all relevant times hereto, an owner of Harvest Capital common stock.

2

7. Defendant Harvest Capital is a business development company providing structured credit to small businesses and specializing in leveraged buyouts, add-on acquisitions, recapitalizations, growth financings and debt refinancing investments. The Company is incorporated in Delaware and its principal executive offices are located in New York, NY. The Company's common stock trades on the Nasdaq Global Market under the ticker symbol, "HCAP."

8. Defendant Joseph A. Jolson ("Jolson") is Chief Executive Officer and Chairman of the Board of the Company.

9. Defendant Richard P. Buckanavage ("Buckanavage") is a Co-Founder and a director of the Company.

10. Defendant Dorian B. Klein ("Klein") is a director of the Company.

11. Defendant Jack G. Levin ("Levin") is a director of the Company.

12. Defendant Richard A. Sebastio ("Sebastio") is a director of the Company.

13. Defendants Jolson, Buckanavage, Klein, Levin, and Sebastio are collectively referred to herein as the "Individual Defendants."

14. Defendants Harvest Capital and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

15. On December 23, 2020, Harvest Capital and Portman announced that they had entered into a definitive agreement under which Harvest Capital would merge with and into Portman. The press release announcing the merger states, in pertinent part:

**Harvest Capital Credit Corporation to Merge into Portman Ridge Finance Corporation**

**Combined Entity Will be Managed by an Affiliate of BC Partners Advisors L.P.; Companies to Host Conference Call at 8:30 AM ET on December 24, 2020 to Discuss**

December 23, 2020 18:10 ET | **Source:** Portman Ridge Finance Corporation

NEW YORK, Dec. 23, 2020 (GLOBE NEWSWIRE) -- Harvest Capital Credit Corporation (NASDAQ: HCAP) ("HCAP") and Portman Ridge Finance Corporation (NASDAQ: PTMN) (the "Company" or "PTMN") announced today that they have entered into a definitive agreement under which HCAP will merge with and into PTMN, a business development company managed by Sierra Crest Investment Management LLC ("Sierra Crest"), an affiliate of BC Partners Advisors L.P. ("BC Partners").

The transaction has been approved by a unanimous vote of Special Committee of the Board of Directors of HCAP, the Board of Directors of HCAP (other than directors affiliated with HCAP's external investment adviser who abstained from voting) and the Board of Directors of PTMN. In addition, the Board of Directors of HCAP will recommend that HCAP stockholders vote in favor of adoption and approval of the definitive merger agreement, subject to certain closing conditions.

**Transaction Highlights**

- The combined company will be externally managed by Sierra Crest and is expected to have total assets of approximately $757 million, and a net asset value of approximately $248 million (each based on September 30, 2020 balance sheets, adjusted for estimated transaction expenses and PTMN's recent merger with Garrison Capital Inc.);

- Stockholders should expect to realize net investment income per share accretion following the closing of the transaction;

- The transaction is expected to deliver operational synergies for the combined company as a result of the pro forma larger scale and elimination of redundant HCAP expenses;

- Certain significant stockholders of HCAP have entered into voting support agreements with PTMN and agreed to vote their HCAP shares in favor of the transaction, which shares represent in aggregate approximately 31.6% of HCAP's shares outstanding as of December 22, 2020; and

- Following the transaction, current HCAP stockholders are expected to own approximately 16.6% of the combined company.

In connection with the transaction, HCAP stockholders will receive aggregate consideration equal to HCAP's net asset value at closing. This consideration will

4

be funded using PTMN shares (valued at 100% of PTMN's net asset value per share at the time of closing of the transaction) and, to the extent the required number of PTMN shares exceeds 19.9% of the issued and outstanding shares of PTMN common stock immediately prior to the transaction closing, cash consideration in the amount of such excess. As described below, HCAP stockholders will have an opportunity, subject to certain limitations, to elect to receive either cash or PTMN shares in consideration for their HCAP shares. Additionally, all HCAP stockholders will receive an additional cash payment from Sierra Crest of $2.15 million in the aggregate, or approximately $0.36 per share.

Assuming a transaction based on respective September 30, 2020 net asset values for HCAP and PTMN, adjusted for expected transaction expenses and PTMN's recent merger with Garrison Capital Inc., the merger transaction (including the Sierra Crest additional cash payment) currently values HCAP shares at approximately $10.11 per share which represents 104% of HCAP's September 30, 2020 net asset value (net of transaction expenses). Using PTMN's closing price of $1.80 on December 22, 2020, the merger transaction (including the Sierra Crest additional cash payment) currently values HCAP shares at approximately $7.71 per share, which represents 79% of HCAP's September 30, 2020 net asset value (net of estimated transaction expenses) and a 30% premium to HCAP's closing price on December 22, 2020.

If the aggregate merger consideration is to be paid in cash as well as PTMN stock because of the 19.9% stock issuance limitation described above, HCAP common stockholders will have the ability to elect to receive consideration in the form of cash or stock, with the exchange ratio for the total consideration to be paid by PTMN in the merger being determined by the net asset value of HCAP and PTMN as of the closing, calculated as of 5:00 p.m. New York City time two days prior to the closing of the transaction. While each HCAP stockholder will receive the same per share consideration, stockholders receiving PTMN shares will receive a number of PTMN shares equal to the HCAP net asset value per share as of 5:00 p.m. New York City time two days prior to the closing of the transaction divided by the volume-weighted average price of PTMN stock for the 10-trading day period ending two days prior to the date of the closing. HCAP common stockholders may receive consideration from PTMN that includes both cash and stock, depending on their election and the elections of other stockholders. HCAP stockholders who do not make a stock or cash election will be deemed to have elected to receive stock in connection with the merger.

In addition to approval by HCAP stockholders, the closing of the merger is subject to customary conditions. The parties currently expect the transaction to be completed in the second calendar quarter of 2021.

*   *   *

**Transaction Advisors**

Keefe, Bruyette & Woods acted as financial advisor to HCAP's Special Committee. Dechert LLP served as counsel to HCAP and HCAP's Special Committee and Simpson Thacher & Bartlett LLP served as counsel to PTMN.

\*     \*     \*

**About Harvest Capital Credit Corporation**

Harvest Capital Credit Corporation (NASDAQ: HCAP) provides customized financing solutions to privately held small and mid-sized companies in the U.S., generally targeting companies with annual revenues of less than $100 million and annual EBITDA of less than $15 million. HCAP's investment objective is to generate both current income and capital appreciation primarily by making direct investments in the form of senior debt, subordinated debt and, to a lesser extent, minority equity investments. HCAP is externally managed and has elected to be treated as a business development company under the Investment Company Act of 1940. For more information about HCAP, visit www.harvestcapitalcredit.com.

**About Portman Ridge Finance Corporation**

Portman Ridge Finance Corporation (NASDAQ: PTMN) is a publicly traded, externally managed investment company that has elected to be regulated as a business development company under the Investment Company Act of 1940. PTMN's middle market investment business originates, structures, finances and manages a portfolio of term loans, mezzanine investments and selected equity securities in middle market companies. PTMN's investment activities are managed by its investment adviser, Sierra Crest Investment Management LLC, an affiliate of BC Partners Advisors L.P.

PTMN's filings with the SEC, earnings releases, press releases and other financial, operational and governance information are available on PTMN's website at **www.portmanridge.com**.

16.     On January 27, 2021, Defendants caused to be filed with the SEC a Form N-14 Registration Statement (the "Registration Statement") under the Securities Act of 1933 in connection with the Proposed Transaction.

**B. The Registration Statement Contains Materially False and Misleading Statements and Omissions**

17.     The Registration Statement, which recommends that Harvest Capital shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information

6

concerning: (i) Harvest Capital's and Portman's financial projections; (ii) the financial analyses performed by Harvest Capital's Special Committee's[1] financial advisor, Keefe, Bruyette & Woods, Inc. ("KBW"), in connection with its fairness opinion; (iii) potential conflicts of interest involving KBW; and (iv) the sales process leading up to the Proposed Transaction.

18.   The omission of the material information (referenced below) renders the following sections of the Registration Statement false and misleading, among others: (i) Background of the Mergers; (ii) HCAP Reasons for the Mergers; (iii) The HCAP Board Recommendation; (iv) Opinion of the Financial Advisor to the HCAP Special Committee; and (v) Certain Prospective Financial Information Provided by HCAP.

19.   Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote on the Proposed Transaction, Harvest Capital shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

---

[1] The Special Committee refers to the purported independent directors of the Company (Defendants Klein, Levin, and Sebastiao) who were delegated power to, among other things, "(i) select and retain financial and legal advisors to aid the HCAP Special Committee in fulfilling its duties; (ii) communicate with third parties with respect to and solicit from any third parties inquiries relating to potential strategic alternatives for HCAP, including with respect to the procedures by which any such parties may submit proposals to HCAP relating thereto and information required to be furnished by the parties in conjunction therewith; (iii) negotiate or authorize others to negotiate, any offer made in connection with any potential strategic transaction, (iv) reject any offers relating to any potential strategic transaction which the HCAP Special Committee determined it could not favorably recommend to the HCAP Board; (v) recommend to the HCAP Board any potential strategic transaction which the HCAP Special Committee may approve, subject to final approval by the HCAP Board; and (vi) take any and all other actions with all the power and authority of the HCAP Board as the HCAP Special Committee may deem to be necessary or appropriate in order for the HCAP Special Committee to discharge its duties." *See* Registration Statement at 42-43.

## 1. Material Omissions Concerning Harvest Capital's and Portman's Financial Projections

20. The Registration Statement omits material information concerning Harvest Capital's and Portman's financial projections.

21. The Registration Statement summarily states, in a single sentence in the section entitled "Certain Prospective Financial Information Provided by HCAP," that "HCAP provided the HCAP Special Committee and KBW with certain prospective financial information indicating, among other things, that projected dividends of HCAP were zero."[2] *See* Registration Statement at 70-71.

22. The Registration Statement further provides that, in connection with its fairness opinion and related financial analyses, KBW considered:

- financial and operating forecasts and projections of HCAP that were prepared by, and provided to KBW and discussed with KBW by HCAP management and that were used and relied upon by KBW at the direction of such management and with the consent of the HCAP Special Committee; and

- publicly available consensus "street estimates" of PTMN (as adjusted by PTMN management in the case of 2021 net investment income), as well as assumed long-term PTMN growth rates provided to KBW by PTMN management, all of which information was discussed with KBW by PTMN management and used and relied upon by KBW based on such discussions, at the direction of HCAP management and with the consent of the HCAP Special Committee.

*See* Registration Statement at 62.

23. Yet the Registration Statement fails to disclose any of Harvest Capital's and Portman's financial projections, despite the fact that they not only exist, but were prepared or

---

[2] The remaining text in this section contains cautionary, boilerplate language concerning the "prospective financial information set forth above," which, again, consists solely of the statement that "HCAP provided the HCAP Special Committee and KBW with certain prospective financial information indicating, among other things, that projected dividends of HCAP were zero."

adjusted by Harvest Capital's and Portman's respective managements and were relied upon by KBW in connection with its fairness opinion and related financial analyses.

24. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and combined company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

25. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**2. Material Omissions Concerning KBW's Analyses**

26. In connection with the Proposed Transaction, the Registration Statement omits material information concerning analyses performed by KBW.

27. With respect to KBW's "*Selected Companies Analysis*" and "*Selected Transactions Analysis – Business Development Companies*," the Registration Statement fails to disclose the individual multiples and financial metrics of the companies and transactions KBW observed in its analyses.

28. The Registration Statement fails to disclose the following concerning KBW's "*Discounted Cash Flow Analysis of HCAP*": (1) the financial and operating forecasts and projections of Harvest Capital that were provided by Harvest Capital management; (2) the cash flows used in the analysis; (3) the individual inputs and assumptions underlying the (i) discount

9

rates ranging from 14.0% to 17.0%, and (ii) range of 0.6x to 1.0x to Harvest Capital's estimated NAV per share as of December 31, 2022; and (4) Harvest Capital's implied terminal value.

29. The Registration Statement fails to disclose the following concerning KBW's "*Dividend Discount Analysis of PTMN*": (1) the "street estimates" of Portman (as adjusted by Portman management in the case of 2021 net investment income) and assumed long-term growth rates for Portman as provided by Portman management; (2) the individual inputs and assumptions underlying the (i) discount rates ranging from 10.0% to 13.0%, (ii) terminal multiple range of 0.6x to 1.0x, and (iii) terminal dividend yield range of 12.0% to 8.0%; (3) the estimated future dividends of Portman over the period from the assumed Closing Date through December 31, 2024; and (4) Portman's implied terminal value.

30. With respect to KBW's "*Liquidation Analysis of HCAP*," the Registration Statement fails to disclose the projections of net proceeds that could be generated in a hypothetical liquidation and wind-down of Harvest Capital that were prepared by Harvest Capital management.

31. The valuation methods, underlying assumptions, and key inputs used by BofA in rendering its purported fairness opinion must be fairly disclosed to Alexion shareholders. The description of BofA's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Alexion shareholders are unable to fully understand BofA's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**3. Material Omissions Concerning Potential Conflicts of Interest Involving KBW**

32. The Registration Statement omits material information concerning potential conflicts of interest involving KBW.

33. The Registration Statement lists various services KBW purportedly performed for Portman (formerly named KCAP prior to April 1, 2019) during the two years preceding the date of its opinion and discloses that "KBW received aggregate fees of approximately $1 million from KCAP and PTMN" in connection with those services. The Registration Statement goes on to state that, "[i]n addition, as of the date of its opinion, an affiliate of KBW was engaged by PTMN to act as its agent to repurchase shares of PTMN Common Stock pursuant to a Rule 10b5-1 stock trading plan."

34. It appears, however, that the Registration Statement fails to disclose the amount of compensation that KBW's affiliate received or expects to receive from Portman for acting "as its agent to repurchase shares of PTMN Common Stock pursuant to a Rule 10b5-1 stock trading plan."

35. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

36. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

    **4. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction**

37. The Registration Statement omits material information concerning the sales process leading up to the Proposed Transaction.

38. The Registration Statement provides that, during the sales process, Harvest Capital entered into confidentiality agreements with potential buyers.

39. The Registration Statement, however, fails to make clear whether ***all*** confidentiality agreements entered into between Harvest Capital and potential buyers and/or strategic partners contained standstill provisions with "don't ask, don't waive" (DADW) provisions (including their time of enforcement) that would preclude interested parties from making superior offers for the Company.[3]

40. Without this information, Harvest Capital shareholders may have the mistaken belief that potential suitors are or were permitted to submit superior proposals for the Company, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Harvest Capital shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior proposal.

41. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

42. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

43. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Registration Statement specified

---

[3] While the Registration Statement provides that the Board approved a form confidentiality agreement with a customary standstill provision with DADW provisions which would allow bidders to confidentially request a waiver of the standstill after a strategic transaction had been publicly announced, it is unclear whether this form was used with all prospective buyers and strategic partners during the sales process leading up to the Proposed Transaction. *See* Registration Statement at 39.

above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

44. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Registration Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Registration Statement.

45. The false and misleading statements and omissions in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

46. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

47. Because of the false and misleading statements and omissions in the Registration Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions

13

as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Registration Statement.

50. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Registration Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

51. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Registration Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Registration Statement.

52. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and

information that they reviewed and considered—descriptions which had input from the Individual Defendants.

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 24, 2021                     Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
          zhalper@halpersadeh.com

*Counsel for Plaintiff*